David W. Rizk (SBN 284376)
Adam F. Shearer (SBN 279073)
RIZK & SHEARER LLP
466 Geary Street, Suite 201
San Francisco, California 94102
(415) 870-3007
drizk@rs-llp.com
ashearer@rs-llp.com

Counsel for Defendant Shaukat Shamim

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHAUKAT SHAMIM,<br><br>Defendant. | **Case No.:** CR 22–227 JD<br><br>**DEFENDANT SHAUKAT SHAMIM'S SENTENCING MEMORANDUM**<br><br>**Date:** Mar. 10, 2025<br>**Time:** 10:30 a.m.<br><br>**REDACTED** |

1

2

**TABLE OF CONTENTS**

3

**INTRODUCTION** …………………………………………………………….. 1

**BACKGROUND** …………………………………………………………… 2

    **A.**    **Shaukat Shamim** …………………………………………………… 2

           1.  Upbringing and Professional Career ……………………………… 2

           2.  Family Life and Medical Issues ………………………………… 4

           3.  Community and Letters of Support ………………………………… 5

    **B.**    **YouPlus** ………………………………………………………... 7

    **C.**    **YouPlus Becomes Pyxis.ai** …………………………………….... 9

**LEGAL STANDARD** ……………………………………………………… 11

**DISCUSSION** ……………………………………………………………… 12

    **A.**    **The Nature and Circumstances of the Offense Do No Support a Prison Sentence Greater than 12 Months** ………………………………… 12

           1.  The Offense Conduct ………………………………………… 12

           2.  YouPlus' Successor Company, Pyxis.ai, Operates Today …………………… 14

           3.  Mr. Shamim Did Not Profit from the Offense – and has Experienced Significant Losses ………………………………………… 15

    **B.**    **Mr. Shamim's Personal History and Characteristics Do Not Support a Prison Sentence Longer than 12 Month** ………………………………… 16

           1.  Mr. Shamim's Reputation for Honesty, Integrity, and Generosity ……………… 16

           2.  Mr. Shamim's Support and Caretaking for his Family ……………………… 19

    **C.**    **A Prison Sentence Longer Than 12 Months Would Not Serve the Goals of Just Punishment, Deterrence, and Public Safety** ………………………… 19

    **D.**    **The Court Should Consider Mr. Shamim's Sentence in the Context of Other Similar Cases** ………………………………………………… 21

**CONCLUSION** ……………………………………………………………… 22

**INTRODUCTION**

Shaukat Shamim has earned a reputation for integrity and caring for others in almost thirty years working in tech entrepreneurship in Silicon Valley. Mr. Shamim, who is a self-described "serial entrepreneur," has founded eleven companies over the years, serving as a mentor and leader to both his own employees and hundreds of other entrepreneurs eager for guidance. Given Mr. Shamim's experience of enduring the ups and downs of the tech industry, he's been a resource for many in learning how to build and sustain a career in the valley. Meanwhile, Mr. Shamim has diligently tended to a delicate homelife, including helping his wife ███████████████████████ and dedicating extra love and care to his autistic son. Having come to America at the age of eighteen from Bangladesh, Mr. Shamim never forgets where he came from—or how, through strength of character and hard work, he got here.

And yet Mr. Shamim stands convicted by his guilty plea of securities fraud against the investors of his defunct company YouPlus, for misrepresenting actual revenues and customers paying for the product. Mr. Shamim is the first to acknowledge that this crime is irreconcilable with decades of upstanding work for the Bay Area tech community and beyond. As he states in his letter to the Court, he deeply regrets his dishonest actions, not just because they have upended his life, but because they harmed his investors and employees who placed their trust in him, and tarnished his reputation he worked so hard, for so long, to establish. Ex. 1 to the Declaration of David Rizk ("Rizk Decl.").

The Court should impose a sentence that promotes respect for the law and underscores the centrality of fair play in the startup world. At the same time, the Court must consider Mr. Shamim's offense in the context of an otherwise unblemished career and demonstrated commitment to ethical conduct in business and in life. For the reasons set forth herein, the Court should find that a sentence of 12 months in custody followed by six months of home confinement, is sufficient but not greater than necessary to achieve the goals of sentencing.

//
//
//
//

# BACKGROUND

**A.    Shaukat Shamim**

### 1.    Upbringing and Professional Career

Mr. Shamim grew up in northern Bangladesh with his parents and sister in a modest home.  In 1971, the same year Mr. Shamim was born, his three-year-old brother died of diphtheria, a bacterial infection for which a vaccine was available for widespread use beginning in the 1920s, but didn't make its way to Bangladesh until the late 1970s.  His older brother's death cast a pall over his family, and Mr. Shamim, even though he never met him, shared in the family's struggle throughout his childhood to accept the loss.

Beginning when he was a young teenager, Mr. Shamim dreamed of building his own company, and he was fascinated by the computer age that was dawning.  His father was a widely-respected journalist, serving in the mid-1980s as the head of Reuters, which housed early computer technology.  Mr. Shamim would visit his father at work and would dabble with the machines, learning some of the basic code.  Mr. Shamim could see the massive potential for computing technology to change businesses—as well as its potential to open up his own life and help create a future beyond his home Bangladesh.

At the age of 18, Mr. Shamim jumped at his first opportunity to fulfill his dream and immigrated to the United States to attend college at San Francisco State University.  He later transferred to the University of Texas in Austin where he received a bachelor's degree in computer science.  After a few years in Oregon, he made his way back to the Bay Area and settled in Santa Clara, where he has lived for the past 28 years.

Accompanying him to America and through his studies was his wife, Saima Haque, who grew up in the same neighborhood as Mr. Shamim and has known him most of their lives.  They began dating in the 11th grade and have been together ever since.  The couple have two children, a 17-year-old son and a 16-year-old daughter.

Mr. Shamim's first attempt to start a company was right out of college, but Mr. Shamim quickly realized that he didn't have the necessary training and changed course, working instead at a small handful of tech companies in the mid-90s before settling at Yahoo in 1997.  At Yahoo, Mr. Shamim excelled.  He led the technical build-out of Yahoo Messenger,

an early feat for consumer-facing applications that are widespread today. Yahoo Messenger became one of the most popular messaging applications of the time, gaining Mr. Shamim considerable attention and interest regarding his next move. He knew he wanted to start out on his own, so he left Yahoo in 2001, aiming to fulfill his childhood dream.

Even without a solid idea for his theoretical company, Mr. Shamim had immediate financial backing, to the tune of $1 million from two venture capital funds. Mr. Shamim eventually settled on an idea for the company—creating networking hardware, which was then en vogue—but after several months it became clear to Mr. Shamim that the technological area was not his expertise, which was consumer-related software applications. Mr. Shamim returned the money to the investors, telling them that he couldn't keep it until he had an idea that he could turn into a successful company.

Mr. Shamim spent the next few years at a small venture capital firm, becoming a partner and working with numerous startups in the early 2000s before leaving in 2005 to found Rhythm NewMedia, an early pioneer of video advertising that would successfully grow into the mobile age. After a few years, Mr. Shamim chose to leave the company after coming to the conclusion that the increasing management responsibilities were not in-line with his interests or skill set. So, Mr. Shamim founded a new company called Buysight, which focused on targeted advertising technology. Buysight raised a total of approximately $25 million before being acquired by AOL's advertising arm in 2012. Mr. Shamim, however, had left the company approximately ten months before the purchase because, as with Rhythm NewMedia, the company's growth led to increased management responsibilities, which Mr. Shamim had neither the interest nor capacity to assume. Instead, he relinquished the CEO role and hired a management team in his place.

While both Rhythm NewMedia and Buysight were successful companies, neither made Mr. Shamim a particularly wealthy man. From their sales, Mr. Shamim walked away with approximately $1 million, which he would use to help fund his future companies. In terms of salary, Mr. Shamim was paid between $175,000 to $275,000 per year at his companies, including YouPlus.

Mr. Shamim's next company—Dezine, which sought to create a marketplace for unknow designers—was not a success. After less than two years and just $1.3 million raised, the company folded and investors lost their investments. Because Mr. Shamim was deeply bothered by the investors' loss, Mr. Shamim voluntarily used his shares in his next venture (YouPlus) to compensate Dezine investors. As Dezine investor Reza Kazemipour states in his letter to the Court, this "extraordinary" action is "almost unheard of" in the tech startup world and an example of Mr. Shamim's accountability and integrity. Ex. 2 to Rizk Decl. Nonetheless, the failure of Dezine would weigh on Mr. Shamim in the years ahead.

2. <u>Family Life and Medical Issues</u>

Mr. Shamim considers himself lucky to enjoy a loving and supportive family. But the Shamim family, more than is typical, face serious challenges for which Mr. Shamim has been the rock. █████████████████████████████████████████████

1

2

3

4

5

6

7

8

Mr. Shamim's family life back in Bangladesh has also presented out-of-the-ordinary challenges and heartbreak. In 2000, Mr. Shamim's 34-year-old sister, who had become the center of their family, died from dengue fever during the first major outbreak of the virus in Bangladesh's history. Mr. Shamim and his family believe that his sister was mistreated by unprepared doctors, leading to her premature death. His sister left behind a young daughter, who also tragically passed away in 2017 of a sudden heart attack. With his father gone (having passed in 2015), his mother is the only immediate family member remaining in Bangladesh. Mr. Shamim has struggled deeply to come to terms with the fact that his brother, sister, and niece all passed away before reaching the age of thirty-four.

### 3. Community and Letters of Support

Despite facing these personal challenges and premature deaths of close family members, Mr. Shamim for decades has exuded a positive outlook on the world and has been a force for good, whether he's encouraging and mentoring other entrepreneurs, or helping the disadvantaged in Bangladesh and India, or just being there for a friend at a low point. As the nearly thirty letters submitted to the Court show, Mr. Shamim has spent a substantial amount of his time positively impacting others, both before and after his offense. For example, twenty-five years ago, Mr. Shamim organized a conference that brought hundreds of Bangladeshi entrepreneurs to the Bay Area to foster connections and opportunities for growth, as described in the letter from Mashuque Rahman. Rizk Decl., Ex. 2. According to Tina Jabeen, who is enmeshed in the Bangladeshi tech world and has known Mr. Shamim for over thirty years, Mr.

Shamim has been one of Bangladesh's most-notable entrepreneurs and has been a key figure in leading its technological development through his mentorship and desire to lift up others. *Id.*

In addition, for over 20 years, Mr. Shamim has been part of the TiE Foundation, a global nonprofit whose mission is to generate and nurture the next generation of entrepreneurs. Mr. Shamim served on its board for nine years, helping to build the organization, bring other celebrated industry leaders into its orbit, and personally mentored hundreds of entrepreneurs along the way. *Id.* (R. Kazemipour; V. Bhandarkar).

Through his work with other entrepreneurs and founding of multiple companies, Mr. Shamim grew a sterling reputation in the tech business world up until his offense here. For example, Tzahi Weisfeld, a long-time business colleague of Mr. Shamim's, writes that his previous observations of Mr. Shamim's business dealings have "consistently been transparent and honest, even when it might have been easier to be otherwise." *Id.* Another letter writer, with over three decades of experience in leadership positions in the financial services industry, states: "Having worked alongside countless professionals in high-stakes environments, I can confidently say that Shaukat stands apart for his exceptional character." *Id.* (R. Khaleel). And a retired Fenwick & West partner who has represented over a thousand companies in his career and worked with Mr. Shamim at Rhythm NewMedia, Buysight, Dezine, and YouPlus, writes that Mr. Shamim "is among the highest in ethical conduct." *Id.* (W. Schreiber).

Mr. Shamim and his wife have also been involved in multiple Bay Area organizations focused on helping Bangladeshis access life-saving healthcare and educational opportunities. Specifically, Mr. Shamim and his wife have been deeply involved with SpaandanB, a twenty-five-old organization for which they provided the initial funding and continued to support over the years. Mr. Shamim's wife, who has a graphic design and marketing background, created the organizations logo and branding. They've also been a major contributor to ECHO, a similar organization that works directly with rural farmers. Mr. Shamim feels a close connection to the work of these organizations given the loss of both of his siblings to premature deaths that could have been prevented with access to vaccines and adequate medical treatment.

//

//

**B.      YouPlus**

In November 2013, following the disappointment of Dezine, Mr. Shamim conceived of a new idea for an app that collects promotions that customers could redeem at participating business through self-serve kiosks—similar to the promotions and awards programs now common on businesses' payment terminals.  While Mr. Shamim's idea for the new company, which he named YouPlus, seemed promising, it struggled to gain any traction.  From November 2013 through March 2017, the company raised approximately $4 million, with an average investment of approximately $97,000.

Over the first three years, YouPlus ran out of money seven times.  Mr. Shamim and his wife repeatedly poured their own money into the company—hundreds of thousands of dollars—particularly during the early years.  They exhausted their savings, including the college funds for their kids, to try to keep the company afloat.  Mr. Shamim and his wife's family finances were so enmeshed with the company's that it was difficult to see where one ended and the other began.  In fact, a company credit card for YouPlus did not even exist until approximately October 2016—nearly three years after Mr. Shamim started the company.

In mid-2017, the company ran out of money for the eighth time, and Mr. Shamim believed the company's time was over.  He was going broke.  The money he earned from the sale of his previous companies was gone.  Sadly, YouPlus appeared like another Dezine—a failed company, which at the time was Mr. Shamim's worst fear.

But before folding up shop entirely, Mr. Shamim reached out to a former Yahoo colleague who had a background in AI, and together they crafted a new direction for the company.  The current YouPlus app had video functionality that allowed consumers to post video of their experiences—say, a review of a new cafe that offered a free coffee promotion through YouPlus.  But it took considerable time for anyone to watch the videos and glean any significant takeaways.  Mr. Shamim and his co-founder decided to pivot the company to try to solve this problem of video analysis for consumer-driven businesses.  Their bet was that the emerging field of AI would provide businesses with a hyper-efficient means to analyze and digest videos from consumers, which were (and still are) flooding the internet.

There was instant investor attraction to this new version of YouPlus. Happiness Ventures, who declined to fund the first version of the company, invested $2 million in the latter half of 2017 at the dawn of the rebooted YouPlus. By the end of 2017—just six months after pivoting the company—Mr. Shamim and his co-founder had something to show for the excitement: they had made a significant breakthrough in advancing the company's core technology, the Video Opinion Index and Search Engine ("VOISE"), which was designed to collect and break down consumer-made videos into thematic parts and produce AI-generated insights for marketing brand managers.[1] The breakthrough involved the first part of the equation—breaking down the videos into thematic parts—an accomplishment that significantly boosted the value of the technology. There was still a long way to go to fulfill the ultimate goal of the company's technology—namely, a fully automated AI video analysis platform—but important progress was being made. The advancing technology garnered interest from a range of name-brands, including BMW and Coca-Cola.

As interest and excitement for the company's new direction soared, Mr. Shamim faltered. While he had plenty of experience founding companies, he lacked any experience leading a company with more than 50 employees. When his previous companies grew any larger, he promptly left given his limitations in running a large organization. Mr. Shamim was unprepared and overwhelmed by the sudden growth of YouPlus, which climbed from around 50 employees in mid 2018 to slightly less than 300 at its peak in 2019. More fundamentally, as he recounts in his letter to the Court, the failure of Dezine and the near failure of YouPlus weighed on Mr. Shamim to the point where he was willing to prove himself at any cost to ensure that YouPlus was a successful company for his investors, employees, and those that looked up to him. Ex. 1 to Rizk Decl.

Around the same time, in early 2018, he began exaggerating the extent of the company's progress with VOISE, leaving investors with the impression that the technology had fully automated AI functionalities when it was still an unfinished product, with some parts of VIEW and VISION working better than others. In late summer 2018, Mr. Shamim also began

---

[1] YouPlus had two products it built on top of VOISE: VIEW and VISION.

to provide incorrect and false information regarding the company's revenue. While YouPlus was gaining traction with a host of brands and companies, running trial exercises for them, and being told that millions of dollars in marketing budgets were in play—its ability to charge clients for its services was in its infancy. Rather than being honest with investors about where the company stood in the development cycle, Mr. Shamim made the foolish and costly decision to pretend the company had made more progress with clients than it really had.

At the same time, in the beginning of 2019 YouPlus brought on as a client the largest advertiser in the world, Proctor & Gamble, which has a yearly ad spend approaching $10 billion. While the potential work with P&G was enormous, the reality in terms of actual revenue was more modest, approaching just under six figures. Mr. Shamim nonetheless believed the work with P&G validated his contorted worldview that progress and traction with big-named clients excused misstatements and falsities to investors.

By September 2019, YouPlus was running low on cash, having no consistent sources of revenue, contrary to what Mr. Shamim had been telling investors over the last year. This coincided with the company's decision to begin its Series A fundraising round, nearly six years after the initial launch. In a desperate attempt to avoid failure and keep the company afloat, and to conceal his previous false statements, Mr. Shamim altered YouPlus bank statements to show deposits that did not exist and placed them in a shared drive for review by investors, who were demanding full transparency into the company's finances. Mr. Shamim's changes to investor-related documents were hasty and amateurish and readily identified as being altered.

Once confronted with his misrepresentations, Mr. Shamim did not come clean, but he assisted the Board of Directors and investors with tracking down customer documents and financial materials needed to accurately account for the company's revenues. Within weeks, in November 2019, Mr. Shamim resigned as CEO and from his position on the Board.

## C.    YouPlus Becomes Pyxis.ai

Following Mr. Shamim's resignation, the reconstituted three-member Board went to work restructuring YouPlus so it could continue as a company with the same technology and target market. Led by YouPlus' most active and involved investor—the CXO Fund, who had members in executive roles at the company over the last year—the Board recognized and

shared with investors in late December 2019 that, "[w]hile the current state of the Company's AI platform is incomplete, it is working as envisioned." Ex. 3 to Rizk Decl., p.2. The Board estimated that six months of development effort were needed to make the YouPlus platform more fully automated. *Id.*

The Board specifically identified that "the Company's clients have positive experiences with the technology envisioned, and its anchor Fortune 50 client [P&G] sees the technology as a key enabler of their business and remains highly supportive of the Company's platform with plans to adopt it more broadly as the product matures." *Id.* The Board's continued belief in the company's technology and idea, it told investors, "is informed by the fact that we have seen the platform work (admitted [sic] in a less than desirable or efficient way) and we have spoken to clients to hear their support for the platform based on the value they have received for the Company's work." *Id.* at 3. The Board pitched investors on establishing a new company—then called Video Analytics—which would take on the assets and liabilities of YouPlus, with investors relinquishing their claims against YouPlus in exchange for equity in the new entity. *Id.* at 3-6.

By mid-March 2020, the new entity became Pyxis.ai—a company that has been in continual operation to this day. As laid out in the December 2019 letter to investors, Pyxis leveraged YouPlus' existing technology to quickly stand up the new entity and installed as CTO Anand Srinivasan, the same engineer Mr. Shamim hired as YouPlus's CTO in March 2019. Ex. 4 to Rizk Decl., Bates No. GJ-00002158. In a March 2020 investor presentation, Pyxis highlighted its ongoing work with Proctor & Gamble—work that Mr. Shamim had started over a year earlier. *Id.* at GJ-00002167. Specifically, Pyxis touted as "Our Contribution" to P&G that it "[s]hortened 180-day manual exercise to <40 hours by analyzing 2,500+ (>250 hours of video content) of P&G product categories. Automated audio and video analysis to mine for attributes, sentiments, opinions, and suggestions." *Id.* Pyxis told investors that this technology, which it took on from YouPlus, would help result in projected revenue of $3.2 million in 2021, $9.675 million in 2022, and $18.725 million in 2023. *Id.* at GJ-00002171.

As envisioned in the December 2019 letter, YouPlus investors were eventually invited to recapitalize their investment in Pyxis on favorable terms. Specifically, in August 2020 fundraising materials, Pyxis offered each YouPlus investor one share of Pyxis Series B preferred stock for each dollar invested in YouPlus. Ex. 5 to Rizk Decl., Bates No. GJ-00002115.[2] In exchange, YouPlus investors would waive all obligations of YouPlus to repay cash investments made to it, and a release of all claims against Pyxis, its directors and officers, as well as the CXO Fund and Gril Ventures—the two YouPlus investors who worked closest with Mr. Shamim and took control of the company after his misdeeds came to light. *Id.* The August 2020 fundraising materials also repeat that "[Pyxis] has acquired all intellectual property and similar assets of YouPlus, Inc." *Id.* at GJ-00002111.

Although Mr. Shamim is not privy to the ongoing operations of Pyxis, he is not aware of any YouPlus investor who declined to recapitalize in the new Pyxis entity.[3] Nor is Mr. Shamim aware of any former YouPlus investor who has actually lost money on the investment following recapitalization in Pyxis, which operates as a successful company to this day.

## LEGAL STANDARD

A sentencing court must impose a sentence that takes account of the factors enumerated in 18 U.S.C. § 3553(a). In particular, a court must fashion a sentence that is "sufficient, but not greater than necessary," to serve the purposes of sentencing set forth in the statute. 18 U.S.C. § 3553(a)(2); *see Kimbrough v. United States*, 522 U.S. 85, 111 (2007). As the Supreme Court has explained, "[t]he overarching statutory charge for a district court is to 'impose a sentence

---

[2] As far as Mr. Shamim is aware, Pyxis' offer to recapitalize was extended to all YouPlus investors. Notably, it was not offered to Mr. Shamim—YouPlus' largest shareholder—and at least some of YouPlus stockholders, mostly YouPlus employees in India. Instead, Pyxis—led by the CXO Fund—completely wiped out the YouPlus holdings of Mr. Shamim and the former employees, without any compensation even though the company's technology obviously carried some value, as evidenced by the speedy and successful launch of Pyxis.

[3] On Friday evening, February 21, the government produced a November 2024 email from a YouPlus investor, Doug Greenstein, suggesting that he may not have recapitalized his $200,000 investment into Pyxis. Mr. Shamim is not aware of the circumstances surrounding Mr. Greenstein's dealings with Pyxis, and will reserve examination of them until any hearing regarding restitution, for which Mr. Shamim has already agreed to fund for at least $1 million.

Case 3:22-cr-00227-JD    Document 123    Filed 02/24/25    Page 14 of 24

sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (citing 18 U.S.C. § 3553(a)).

The Sentencing Guidelines are just one factor among many a court must consider at sentencing, *United States v. Ressam*, 593 F.3d 1095, 1117-18 (9th Cir. 2010), and the Court "may not presume that the Guidelines range is reasonable." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court must make an individualized assessment and fashion a sentence that reflects the particulars of the offense and the unique characteristics of the offender. *Ressam*, 593 F.3d at 1117-18.

## DISCUSSION

As set forth in the plea agreement, the parties agree that Mr. Shamim's offense level under the advisory Sentencing Guidelines is 22. Plea Agreement ¶ 7; *see also* PSR ¶ 31. While Mr. Shamim has agreed to recommend a sentence no less than twelve months in prison, the plea agreement allows him to seek a variance from the Court in light of the § 3553(a) factors. For several reasons, Mr. Shamim respectfully urges the Court to impose a sentence of 12 months in prison followed by six months of home confinement.

### A.    The Nature and Circumstances of the Offense Do Not Support a Prison Sentence Greater than 12 Months

1.    The Offense Conduct

Mr. Shamim acknowledges that his offense is serious and warrants prison time. That is why he has already agreed to a sentence of 12 months in prison, and is recommending that it be followed by six months of home confinement, for a total of 18 months in custody. Mr. Shamim made false statements to investors regarding the company's revenue, intentionally conflating serious interest from high-value clients with revenue amounts that were only potential or anticipated. He also gave some investors the misimpression that the technology was further along than it was. When confronted, he was avoidant and failed to immediately and completely level with investors. He is ashamed and embarrassed by his behavior.

DEFENDANT SHAMIM'S SENTENCING MEMORANDUM
22-CR-227 JD

1       While all of this is true, it's also true that YouPlus did have serious interest from name-

2 brand clients. Proctor & Gamble, the world's number one advertiser, was a paying YouPlus

3 client—and, according to Pyxis, continued to be one even after Mr. Shamim's misdeeds came

4 to light. Mr. Shamim and YouPlus' nearly 300 employees were working exhaustively to

5 continue building the product to meet the clients' needs so they could fully monetize the

6 technology. That Mr. Shamim attempted to unlawfully shortcut the development process does

7 not erase the reality that Mr. Shamim was running a real company with actual prospects and

8 top-level customers.

9       Moreover, the AI technology Mr. Shamim and his co-founder created in 2017—eons

10 ago in terms of AI development—was also real and groundbreaking. In addition to

11 sophisticated companies like Proctor & Gamble, AI experts who have examined YouPlus' (and

12 now Pyxis') technology have walked away impressed. In his letter to the Court, Dr. Wesam

13 Sakla, a principal machine learning and artificial intelligence research scientist at Lawrence

14 National Laboratory, describes YouPlus' platform as "solid and innovative" and that it "stands

15 out as a formidable application of [machine learning] and AI to the challenging domain of

16 video data processing, retrieval, and semantic understanding." Ex. 2 to Rizk Decl. Dr. Sakla

17 specifically acknowledges the technology's foresight in integrating active human participation

18 into the AI process, what in the industry is referred to as "reinforcement learning from human

19 feedback (RLHF) and human labeling." *Id.* These techniques, now widely adopted by

20 industry-leaders like OpenAI, involve humans providing "supervised learning" to the AI

21 machines so that they understand "ground truths" necessary to produce meaningful insights in

22 an automated fashion. *Id.*

23       Given this reality, it's incorrect for the PSR to suggest that the loss amount here equates

24 to every dollar invested during the period of the offense conduct, which totals $6,454,950.[4]

25 Rather, "[w]ith respect to the law, Ninth Circuit precedent requires that, in cases of

26 fraudulently induced investment in a company that is not a complete sham, the district court

27 may not assume that the loss inflicted equals the full pre-disclosure value of the stock." *United*

---

[4] To be clear, Mr. Shamim is not contesting the PSR's Guidelines calculation, which is based on the parties' agreement that loss, at least for Guidelines purposes, is more than $3,500,000.

*States v. Lachwani*, No. 3:21-CR-00353-CRB, 2024 WL 295294, at *7 (N.D. Cal. Jan. 25, 2024) (collecting cases and applying to private company) (cleaned up).  As part of a contested loss proceeding in *Lachwani*, Judge Breyer rejected the government's contention that the actual loss equated to the full value of the money obtained during the time the defendant was making misstatements to investors about his startup.  Instead, to reach the loss amount, the *Lachwani* court was required to "disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes."  *Id.* at *8 (quoting *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007)) (cleaned up).  Because Mr. Shamim has already agreed that the loss amount is at least $3,500,000 for purposes of the Guidelines only, the Court does not need to conduct this "disentangling."  At the same time, the Court cannot assume that the loss amount is equal to the dollars invested in YouPlus given that YouPlus wasn't a sham company; in fact, the actual loss amount is necessarily less than the amount of money invested.

      2.    <u>YouPlus' Successor Company, Pyxis.ai, Operates Today</u>

Mr. Shamim worked tirelessly to try to build YouPlus into a successful company.  From 2013 to 2017, he poured the extent of his personal resources into the company, including taping accounts saved for his kids' college expenses.  In mid-2017, he and his new co-founder hit on a new idea for the company, started developing its technology, and the company took off.  That version of the company Mr. Shamim created after years of struggle is the same company that exists today in the form of Pyxis.ai.  As explained above, members of CXO Fund, who were YouPlus executives and investors, created Pyxis.ai within three months of Mr. Shamim's resignation after acquiring all of YouPlus' intellectual property and eventually offering recapitalization to all investors into the new entity.  Five years later, Pyxis still exists today and operates as a successful company serving its clients' marketing needs.

As a result, Mr. Shamim believes virtually all of the YouPlus investors were recapitalized into Pyxis and is not currently aware of any investor losses following recapitalization.  To be sure, in response to Mr. Shamim's request for any restitution claims, the government produced in January one claim from CXO Fund for the entire amount of its

convertible notes in the company.[5]  CXO Fund's claim, however, ignores that they recapitalized their investment into Pyxis, the successor company it created.  While Mr. Shamim will wait until the restitution hearing to fully litigate the issue, the Supreme Court has held that in a context of a loan, a sentencing court "must reduce the restitution amount by the amount of money the victim received in selling the collateral."  *Robers v. United States*, 572 U.S. 639, 640-41 (2014).  As counsel for the government here argued in nearly identical circumstances last year in another case, restitution claims are unripe when note investors are recapitalized because, prior to the sale of the underlying asset, it is unclear under *Robers* whether any loss for restitution purposes has occurred.  *See United States v. Lachwani*, 3:21-CR-00353-CRB, Dkt. Nos. 150, 152.  Mr. Shamim is hopeful that, if any such investor exists, he can one day fully repay them for their losses.  Through his plea, he has already agreed to fund at least $1 million for restitution purposes.  Plea Agreement ¶ 9.

    A prison sentence longer than 12 months would not reflect the reality that virtually all YouPlus investors recapitalized their investment in a company that continued YouPlus' mission, used its technology, and continued to serve its customers—to this day.

    3.    <u>Mr. Shamim Did Not Profit from the Offense – and has Experienced Significant Losses</u>

    By the government's own accounting, from January 2015 through March 2020, Mr. Shamim and his wife—who works in marketing and was a part-time consultant for the company—received a total of $1,185,867 in payments from YouPlus, which translates to a combined $225,879 yearly salary.  That is not a profile in greed.  And while the government argues that Mr. Shamim misused investor funds on extravagant spending, the record does not

---

[5] On Friday evening, February 21, and over the weekend, the government also produced YouPlus investment information for a handful of additional investors, including Furman University and individuals associated with the CXO Fund.  Regarding Furman University, a university representative told the government in September 2020—almost a year after Mr. Shamim's misdeeds came to light—that it had not written down as a loss its $2 million investment in YouPlus because it was going to recapitalize into Pyxis.  Ex. 6 to Rizk Decl., p.4.  To date, the government has not produced any materials showing Furman University has lost any money, let alone the entirety of its YouPlus investment.

support the accusation, as the PSR correctly determined.  Mr. Shamim and his wife have never had a vacation home, a boat, or luxury cars.

Mr. Shamim is the first to acknowledge that YouPlus' expenses were a mess.  For the first two years of the company's existence, it didn't even have a company credit card, thus entangling Mr. Shamim's personal expenses with the company's.  At the time, this didn't feel out of place to Mr. Shamim, who was pouring all of his sweat, tears, and dollars into his company.  For example, Mr. Shamim would often pay employees personally, keeping a rough ledger in his head of where the money was going.  Unfortunately, the disorganized spending continued even as the company began taking on more investments, with some personal expenses being charged to the company's card—and vice versa.  While this clearly qualifies as mismanagement, Mr. Shamim never embezzled investor money from the company and he did his best to ensure everything equaled out.

Currently, Mr. Shamim and his family are struggling financially—and Mr. Shamim has been deemed indigent.  While Mr. Shamim is helping to build two small companies, he and his wife currently make no income.  Instead, they rely on Mr. Shamim's mother in Bangladesh to assist them in helping make ends meet.  When Mr. Shamim resigned from YouPlus, he left with no severance or any deal providing him with legal defense costs, which he bore himself until he ran out of money and was appointed counsel.  Mr. Shamim's equity in the company was wiped out entirely.  Mr. Shamim is hopeful things will turn around, but the reality is that he did not profit from his offense and is suffering financially from its consequences.

**B.    Mr. Shamim's Personal History and Characteristics Do Not Support a Prison Sentence Longer than 12 Months**

1. <u>Mr. Shamim's Reputation for Honesty, Integrity, and Generosity</u>

Judge Jed Rakoff of the United States District Court for the Southern District of New York has explained that he tries at sentencing to ascertain the "essential character" of a defendant; that is, "Are they fundamentally a greedy person?" or "Are they a good person who departed from his/her better impulses?"  *See* Michael Rothfeld, *In Gupta Sentencing, A Judgment Call*, The Wall Street Journal, Oct. 10, 2012, at C1.  Indeed, § 3553(a)'s directive that a district court consider the "history and characteristics" of the defendant often comes

down to that: does the current offense reflect the essence of the person who committed it, or is it an aberrant deviation from an otherwise virtuous life? *See, e.g., United States v. DeRusse*, 859 F.3d 1232, 1237 (10th Cir. 2017) (approving of variance based on "the extent to which the criminal conduct was out of character"); *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012) (granting large downward variance where the defendant's "personal history and characteristics starkly contrast with the nature and circumstances of his crimes").

For nearly two decades before his offense, Mr. Shamim earned an unsullied reputation for honesty, integrity, and generosity in Silicon Valley and beyond. Mr. Shamim acknowledges and takes responsibility for his lies and misrepresentations to investors, which will follow him forever. But they were a deviation from his true character—a fact his prison term should also reflect. While Mr. Shamim has lost many of his friends and supporters because of his offense, there are still dozens who have stood by him and written letters attesting to the person they've known for years. Accomplished and deeply experienced former business colleagues describe Mr. Shamim as "consistently be[ing] transparent and honest, even when it might have been easier to be otherwise," Ex. 2 (T. Weisfeld), and having an "exceptional character" that is "among the highest in ethical conduct," *id.* (R. Khaleel; W. Schreiber). When his company Dezine failed after two years, Mr. Shamim displayed the opposite of greed— offering shares in his next company to compensate the loss to investors, which one Dezine investor called an "extraordinary" action that is "almost unheard of" in the tech startup world and an example of Mr. Shamim's accountability and integrity. *Id.* (R. Kazemipour). Tech community leaders also applaud his decades of commitment to the TiE Foundation, through which Mr. Shamim served as a mentor to hundreds of entrepreneurs around the globe.

Even after his resignation from YouPlus in November 2019 and his indictment in this case in July 2020, Mr. Shamim continued with his life's work of mentorship and entrepreneurship however best he could. He has volunteered extensively for International Technological University in Santa Clara, with its president and CEO writing to the Court that Mr. Shamim's presence at the school "has been nothing short of transformative." Ex. 2 (Y. Chan). Mr. Shamim's volunteering has "touched hundreds of lives, offering guidance, mentorship, and unwavering support to students who look up to him not only for his expertise

but also for his kindness and integrity." *Id.* Consequently, "[h]is absence would leave a void that could not easily be filled." *Id.*

Mr. Shamim has also kept active in the entrepreneur space, co-founding Cre8Lab, an incubator program that has so far stood up two companies, BlueDotWellness and FoundersGuild. Mr. Shamim's Cre8Lab co-founder, who met Mr. Shamim only after he was charged in this case, writes to the Court that Mr. Shamim was open and upfront about the charges. Ex. 2 (A. Raudsalu). While he was initially cautious, he grew to admire Mr. Shamim for his "rare mix of vision, transparency, and genuine desire to create impactful companies." *Id.* Mr. Raudsalu reports that Mr. Shamim has "always ensured that his legal matters were disclosed openly to every new team member, regardless of the challenge it posed." *Id.*

BlueDotWellness, a mental health startup whose mission is to make mental health care accessible and affordable to all, is deeply personal for Mr. Shamim. ███████████████ ██████████████████████████████ and so he's working to change that. His co-founder at the company writes that Mr. Shamim is "one of the most passionate and conscientious people I have ever worked with." *Id.* (M. van Groen). She's observed that "[e]ven as he grappled with the pressure and isolation brought on by his legal situation, he has continued to show up for others, including myself." *Id.* The company has also been something of a personal reckoning for Mr. Shamim, as he's struggled to come to terms with the trauma he has inflicted on himself and those who trust and depend on him. Mr. Shamim has benefited greatly from looking within and taking ownership over his mistakes to ensure they never happen again. *See* Ex. 1 to Rizk Decl.

During the later years of YouPlus, Mr. Shamim failed to live up to his track record demonstrating honesty and integrity. Mr. Shamim has accepted responsibility for his fraud and understands that his actions deserve prison time. But a prison sentence of more than 12 months will be longer than necessary to accomplish the goals of sentencing given Mr. Shamim's demonstrated character for good, both in the decades before the offense and the four years since.

//

//

2.    Mr. Shamim's Support and Caretaking for his Family

Despite his highly active and social work life, Mr. Shamim's reserves the majority of his focus and dedication to his fragile home life. His son, ████████████████████████ is his best friend. He is the rock for his wife, ████████████████████████████████ ████. He's raised his 16-year-old daughter as a confident and outgoing person despite these familial challenges. Mr. Shamim's honorable caretaking has occurred against the backdrop of deep grief beginning from his earliest memories. The death of his three-year-old older brother from preventable illness forever wounded his parents and Mr. Shamim was raised within the constant presence of that loss. More unthinkable tragedy struck when his sister and niece died suddenly and prematurely. Mr. Shamim's ability to keep his family together through this hardship is a testament to his values and character.

A prolonged and unnecessary separation from his family, however, greatly threatens their well-being. As discussed above, ████████████████████████████████████████ ██████████████████████████████████████████. Mr. Shamim knows that even a prison sentence of 12 months will be devastating, but it provides at least some daylight at the end of the tunnel ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████. A prison sentence of 12 months, followed by six months of home confinement, balances the goals of sentencing with the dire needs of Mr. Shamim's family for his physical presence.

**C.    A Prison Sentence Longer Than 12 Months Would Not Serve the Goals of Just Punishment, Deterrence, and Public Safety**

Just punishment, deterrence, and public safety, do not warrant a longer custodial sentence. *See* 18 U.S.C. § 3553(a)(2)(A)-(C). As an initial matter, Mr. Shamim presents no

threat to public safety whatsoever.  He has never committed any other offense in his life and he has been entirely compliant with the conditions of his pretrial release for nearly four years. With the supervision of the magistrate court—which has been monitoring his financial condition for years—Mr. Shamim has spent the last several years working and tending to his family.

With respect to just punishment, sending a man who has never had any trouble with the legal system in his life to custody for a year or more sends a highly punitive message.  The publicity attendant to the case has also punished Mr. Shamim severely already.  Whatever the Court's sentence, he cannot escape the case or the damage to his reputation in the enduring record on the internet and within Silicon Valley.

Finally, as to deterrence: Mr. Shamim himself certainly does not need to be deterred further with a longer prison term.  The offense was out-of-character, and it is certain not to be repeated by Mr. Shamim because he has learned his lesson.  *See* Ex. 1 to Rizk Decl.  He is already *extremely* fearful of serving any custodial sentence in federal prison.  Regarding general deterrence, the most recent evidence from the Sentencing Commission shows that there is no deterrent effect from federal sentences imposed that are less than 60 months; a longer or shorter sentence under that threshold has no statistical impact on the likelihood of recidivism.[6] Accordingly, there is no empirical basis to believe that the sentence urged by the government in this case will have any impact on general deterrence, even in the white collar realm.  Even seemingly-rational professionals who are tempted to commit crimes do not research the potential legal consequences of (let alone sentencing ranges that might result from) their actions in a manner that would validate traditional notions of deterrence.  A sentence of a year in custody followed by six months of home confinement and whatever fines and restitution is owed, is sufficient to serve the purposes of the sentencing statute.

---

[6] U.S. Sentencing Commission, *Length of Incarceration and Recidivism*, June 2022 at 4 ("For federal offenders sentenced to 60 months or less incarceration, the Commission did not find any statistically significant differences in recidivism."), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220621_Recidivsm-SentLength.pdf (last accessed Aug. 23, 2023).

DEFENDANT SHAMIM'S SENTENCING MEMORANDUM
22-CR-227 JD

**D.    The Court Should Consider Mr. Shamim's Sentence in the Context of Other Similar Cases**

Finally, the Court must impose a sentence that avoids unwarranted disparities among similarly situated defendants.  18 U.S.C. § 3553(a)(6).  In a similar case, Judge Breyer (who was initially assigned this case) last spring sentenced a startup founder to 18 months in prison in *U.S. v. Lachwani*.  Like Mr. Shamim, Mr. Lachwani misrepresented to investors his company's revenues, the status with potential customers, and the reach of its technology.  Moreover, when the walls started to close in on him, Mr. Lachwani also forged documents to support his misrepresentations.  *See Lachwani*, 2024 WL 295294, at *11, n.20.  And like with YouPlus, Mr. Lachwani's company, which was not a sham, continued after the fraud.  Following a contested loss hearing, Judge Breyer determined that the loss—out of $92 million invested during the offense period—amounted to $3,149,056, a few hundred thousand dollars below Mr. Shamim's guidelines.  *See id.* at *12.  In determining the loss amount, Judge Breyer "emphasized that this estimate is likely to <u>understate</u> the loss in HeadSpin's value that resulted from Lachwani's criminal conduct."  *Id.* at *11 (emphasis original).

At the same time, there are difference between Mr. Shamim and Mr. Lachwani that weigh in Mr. Shamim's favor.  As the same government counsel in this case argued in *Lachwani*, Mr. Lachwani's scheme entailed huge investment amounts—$100 million— garnering the company unicorn status in Silicon Valley over three rounds of investment.  *See* 21-cr-00353-CRB, Dkt. 128, p.2.  Here, the investment amounts over the life of the scheme are less than $7 million, with all occurring during seed financing when investors know companies are more prone to fail.  In addition, according to the government, Mr. Lachwani sold shares during the scheme, netting $2.5 million, adding to other pay and benefits he received.  *Id.* at p.7.  Here, Mr. Shamim never even attempted to sell any of his shares, taking an average yearly annual salary of only $225,879, which includes payments for his wife who worked for the company for a time as a marketing consultant.  Likely in recognition of these differences, the same government counsel in both cases recommended a prison sentence of 63 months for Mr. Lachwani and, according to the plea, no greater than 41 months for Mr. Shamim.

Given these similarities—and differences—an unjust disparity will exist if Mr. Shamim is sentenced to more time in custody than Mr. Lachwani received.  Thus, 12 months in prison,

following by 6 months in home confinement, is sufficient but not necessary to avoid unwanted disparities among similarly situated defendants.

**CONCLUSION**

For the reasons stated above, Mr. Shamim respectfully requests that the Court impose a sentence of 12 months in prison followed by six months of home confinement.

Date:  February 24, 2025                    RIZK & SHEARER LLP


By:  _____
     David W. Rizk
     Adam Shearer
     Attorneys for Defendant
     SHAUKAT SHAMIM